**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LYDIA GINDULIS GAFFNEY, | ) |
| | ) |
| Plaintiff, | ) No. 08 C 7048 |
| | ) |
| v. | ) Magistrate Judge Cole |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Lydia Gaffney seeks review of the final decision of the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 423(d)(2). Ms. Gaffney asks the court to reverse the Commissioner's decision or remand for further hearing with an award of attorney's fees. The Commissioner seeks an order affirming the decision to deny Ms. Gaffney's application. For the reasons stated below, the Plaintiff's motion is denied, and the Commissioner's motion is granted.

**I.**
**Procedural History**

Ms. Gaffney applied for DIB on April 27, 2006, alleging that she had been unable to work since December 1, 2000 due to back and neck pain. (Administrative Record ("R.") at 63, 184.) Ms. Gaffney also alleged fibromyalgia, headaches, and depression. (R. 65, 184.) The Social Security Administration ("SSA") denied her application both initially (R. 72-75) and after reconsideration (R. 85-87.) Ms. Gaffney timely moved for a hearing before an Administrative Law Judge ("ALJ"), which was received by SSA and was acknowledged by a letter to Ms. Gaffney dated February 7, 2007. (R. 91, 92-93.) The ALJ conducted a hearing on February 20, 2008, at which Ms. Gaffney,

represented by counsel, testified. (R. 13-47). Additionally, Lee Knutson testified as a vocational expert ("VE"). (R. 47-56.) The ALJ found that Ms. Gaffney was not able to perform any of her previous work positions, which included computer analyst, support specialist, and office manager. (R. 69.) However, the ALJ found that Ms. Gaffney was not disabled because she was capable of performing other jobs, including: cashier, order clerk, and surveillance monitor. (R. 70-71.) This became the final decision of the Commissioner when the Appeals Council denied Ms. Gaffney's request for review. (R. 1-5). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Gaffney appealed the decision to the federal district court pursuant to 42 U.S.C. § 405(g). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. §636(c), and each party filed a motion for summary judgment.

## II.
## The Evidence

### A.
### Vocational Evidence

Ms. Gaffney was born on April 5, 1962, (R. 13), and was 43 years old on her date last insured, December 31, 2005. ( R. 124). She is 5'6" and weighs approximately 145 pounds. (R. 14). Ms. Gaffney graduated from high school, attended one year of college, and earned several information technology certifications. *Id.*

In the fifteen years prior to her date last insured, Ms. Gaffney worked primarily in the information technology field, as a computer analyst, an office manager, and a network administrator. (R. 15, 131, 141). These jobs entailed several hours per day of walking and standing, along with occasional stooping, kneeling, and crouching. (R. 131, 142). They would also require some lifting and carrying of computers and equipment, including laptops, monitors, and CPUs. (R. 131, 142-

2

144). In December of 2000, Ms. Gaffney went on maternity leave and did not return to her job. (R. 15).

In March of 2003, Ms. Gaffney began selling children's books in her neighborhood as an independent contractor for a national book distributor. (R. 17-18). Her responsibilities under the arrangement consisted of presenting the books to groups at different locations, taking orders, receiving deliveries of the books, and distributing them. (R. 18). As part of her duties, Ms. Gaffney was required to transport large containers of books, but she was able to rely on others to do the lifting for her. (R. 18-19). Ms. Gaffney left that position during the summer of 2004 due to her difficulty in performing the work and her limited earnings, which were less than $800 annually. (R. 18-20.) Apart from selling books, Ms. Gaffney has not worked since she left for her maternity leave in December of 2000. (R. 20.)

## B.
## Medical Evidence

### 1.
### The Plaintiff's Back Injuries

In approximately 1992, Ms. Gaffney was involved in a car accident. (R. 243). She visited her primary care physician, Dr. Smith, in February 1992. (R. 243, 234). There was no pain in her legs, and the straight leg raise test was negative. *Id.* There was some pain in lumbar flexion, but not upon extension. *Id.* Dr. Smith prescribed physical therapy and Lodine. *Id.* Ms. Gaffney saw Dr. Smith four more times over the next three months, continuing her physical therapy, which has helped with her pain. She also was taking Naprosyn, and had a lumbar facet injection, which did not alleviate her pain. (R. 234-35, 242-43). Ms. Gaffney again sought treatment for her back in August 1993. (R. 237). She complained that pain had increased, and she was suffering some muscle

3

spasms. (R. 237). Dr. Smith prescribed another lumbar facet injection, which provided some intermittent relief. (R. 237, 239). Dr. Smith recommended that she continue her physical therapy, which he did again in a follow-up visit in January 1994. (R. 237, 239).

On July 12, 1996, an MRI of Ms. Gaffney's lumbar spine revealed degenerative disc disease at L5-S1 vertebra with mild disc space narrowing and disc degeneration, and broad-based disc bulging. (R. 244-45). Dr. Smith reviewed the results several days later, concurring with them and prescribing physical therapy. (R. 233). Dr. Smith also recommended an epidural steroid injection, but Ms. Gaffney opted for the physical therapy. (R. 233).

There is no further medical evidence until six years later in June 2002, when Ms. Gaffney saw Dr. Demko for physical therapy. (R. 201). Ms. Gaffney complained of constant pain in her lower back and spasms radiating to her right buttocks. She had three physical therapy sessions that month. (R. 201). She resumed her treatment in May 2003, attending nine sessions. (R. 201, 204). She received spinal manipulation treatment and nutritional and exercise therapy. She reported pain in her lower, middle, and upper back that became worse with activity. Dr. Demko recommended exercise to improve strength. The doctor also noted that she did not fit within any disc disease category. (R. 201).

Ms. Gaffney returned to Dr. Smith for treatment in December 2003, complaining of further lumbar back pain. (R. 232). She reported pain when walking, sitting, standing, ascending and descending stairs, and getting in and out of cars. (R. 232). She got relief from her previous lumbar facet injections, and her chiropractic treatment, yoga, and Motrin were also helping to alleviate her pain. (R. 232). She rated the pain up to 10/10 and complained of right radicular leg pain and numbness. (R. 232). Dr. Smith found that flexion and extension of the lumbar spine caused pain.

4

Ms. Gaffney had full range of motion for her lumbar spine, with pain at the outer edges. (R. 232). Dr. Smith recommended an MRI of the lumbar spine, and prescribed continued physical therapy, along with Bextra, Vicodin, and Soma. (R. 232). Ms. Gaffney had a lumber spine x-ray the same day at Ingalls Memorial Hospital. (R. 246-47). It revealed degenerative changes at L4-5 and L5-S1 from degenerative disc disease. (R. 246-47).

Ms. Gaffney saw Dr. Smith for a follow up on January 26, 2004, complaining that her back pain was exacerbated by stress. (R. 231-32). She did not attend physical therapy and did not undergo an MRI, but she said the Soma and Vicodin prescriptions were giving her excellent relief. (R. 231-32). Dr. Smith renewed her prescriptions for Bextra, Soma, and Vicodin, and recommended physical therapy. Ms. Gaffney visited Dr. Smith again a month later, reporting no relief from her pain after attending one physical therapy session. (R. 231). Dr. Smith prescribed continued physical therapy, Alleve, and using a lumbar spine corset. (R. 231).

Several weeks later, Ms. Gaffney saw Dr. Smith again, complaining of lower back pain. (R. 230). She had been attending physical therapy but reported that it provided only temporary relief. (R. 230). Dr. Smith found that she had full extension and flexion within normal limits. (R. 230). Dr. Smith prescribed Vioxx and recommended that she begin taking Alleve and continue her physical therapy. (R. 230). Ms. Gaffney had another visit with Dr. Smith in May 2004. (R. 230). She reported that her back would occasionally go out, even when sitting, and that the lumbar spine corset did not relieve her pain. (R. 230). Dr. Smith prescribed Soma, Vicodin, Alleve, and referred her for a consultation with Dr. Saxena at the Center for Pain Treatment. (R. 230).

Dr. Saxena saw Ms. Gaffney for the first time on August 6, 2004. (R. 194). She told the doctor she was aware of the triggers for her back pain, so she avoided those actions, which include

5

standing for more than ninety minutes or lifting anything. (R. 194-95). Her pain radiated into both of her legs. (R. 194). Her right leg felt weak and numb and tingled. (R. 194-95). Her left leg also tingled and felt weak. (R. 195). Her pain affected her sleep and was not alleviated by Naprosyn, ibuprofen, Tylenol, or Bextra. (R. 195). Dr. Saxena found that she had trouble walking on her heels but not on her toes, and Romberg's sign was negative. (R. 196). He also found tenderness in her L4-5 and L5-S1 facet joints. (R. 196). Her lumbar spine flexion was extremely limited: 15 degrees, extension was 2 degrees, side bending to the right was 5 degrees, and side bending to the left was 2 degrees. (R. 196). There was no muscle weakness in her legs, but straight leg raising, fabere sign, and Gaenslen's test were all positive. (R. 196). Dr. Saxena prescribed Neurontin along with Hydrocodone and Soma. (R. 196).

Over a month later, an MRI of Ms. Gaffney's lumbar spine showed disc dehydration, disk space narrowing, and small broad-based disk bulging at L5-S1. (R. 282.) There were bony spondylotic changes along vertebral endplates and no other focal disc protrusions, significant scoliosis, acute compression fracture, alignment abnormality, bony destructive lesions, or other significant stenosis. (R. 282). There were minimal degenerative changes along the certerbral endplates and posterior facet joints at L3-4 and L4-5 levels. (R. 282). The diagnosis was degenerative disc disease with small disc bulging and mild bony spondylotic changes at L5-S1. (R. 282).

Ms. Gaffney next saw Dr. Saxena for her back pain in February 2005. (R. 274). Her lower back pain was unchanged, and she continued feeling numbness. (R. 274). Her Vicodin and Soma prescriptions gave her some relief. (R. 274). Some pain radiated to her right leg. (R. 274). Dr. Saxena continued her prescriptions. (R. 274). She saw Dr. Saxena again the next month, reporting

the same level of pain in her lower back and right leg pain. (R. 272). Dr. Saxena continued her prescriptions. (R. 272).

Ms. Gaffney's next visit to Dr. Saxena was in June 2005, and she continued to complain of continued lower back pain. (R. 271). Dr. Saxena continued her prescriptions and increased her dosage of Neurontin. (R. 271). She returned in July, this time reporting that her overall back pain had decreased, and Dr. Saxena continued her prescriptions. (R. 270). In October 2005, Ms. Gaffney was back, this time complaining of chest pain and increased back pain. (R. 269). Two months later, there was no change. (R. 268). It was the same story in February 21, 2006. (R. 267). Because of her pain, she said had to rest for an entire week in January. (R. 267). Dr. Saxena noted that Ms. Gaffney felt pain walking on her heels and, once agin, continued her prescriptions. (R. 267).

Ms. Gaffney did not seek treatment for her back again until 14 months later in April 2007. (R. 263). At that time, she reported the same level of pain in her back. (R. 263). Dr. Saxena noted that side bending was limited, but there was no tenderness. (R. 263). There was no change on June 6, 2007. (R. 262). Dr. Saxena continued her prescriptions on both occasions. (R. 262, 263).

## 2.
### The Plaintiff's Neck Injuries

In 1995, Ms. Gaffney was involved in another car accident, which caused her to suffer from neck pain. (R. 194). She wore a collar for two months and went to physical therapy for two to three months. (R. 194). After that, the first mention of treatment for her neck in the record is in May 2003. She told Dr. Demko that she was having neck pain, off and on, for the last two months. (R. 201, 204). Dr. Demko recommended exercise to improve strength and noted that she did not fit within any disc disease category. (R. 201, 204).

Ms. Gaffney visited Dr. Smith in December 2003, complaining of neck pain which she believed to be caused by a car accident over six years ago. (R. 232). Following the accident, her pain had been relieved with a collar and physical therapy, but it had returned, and along with it, Ms. Gaffney was suffering migraines and having difficulty sleeping. (R. 232). Ms. Gaffney had pain in the posterior aspect of her cervical spine, rated up to 8/10. (R. 232). Dr. Smith found that she had full range of motion for her cervical spine with pain at the end ranges. (R. 232). Her neurology was intact. (R. 232). Dr. Smith planned to have an MRI of the cervical spine done, and prescribed physical therapy, and Bextra, Vicodin, and Soma. (R. 232). Ms. Gaffney had an x-ray of her cervical spine on the same day, the results of which were unremarkable and satisfactory. (R. 248). Lumber spine x-ray showed some degenerative changes at L5-S1, but no evidence of spondylolysis or spondylolythesis. (R. 247).

Ms. Gaffney saw Dr. Smith for a follow up on January 26, 2004 complaining that her neck pain was exacerbated by stress. (R. 231-32). She had not had an MRI due to financial problems, but she reported decreased symptoms from her Soma and Vicodin prescriptions, which were giving her "remarkable relief" and allowing her to get some sleep at night. (R. 231). Dr. Smith renewed her prescriptions, and recommended physical therapy. (R. 231). A month later, having attended one physical therapy session, Ms. Gaffney visited Dr. Smith and told him she had no relief from the session. (R. 231).

Several weeks later, Ms. Gaffney again saw Dr. Smith, and that physical therapy provided only temporary relief. (R. 230). Dr. Smith noted that Ms. Gaffney had cervical radiculopathy. (R. 230). The doctor prescribed Vioxx and recommended that she begin taking Alleve and continue physical therapy. (R. 230).

8

During a visit with Dr. Saxena on August 6, 2004, Ms. Gaffney complained that her neck pain was worsening, radiating into both shoulders and down both arms. (R. 194). She felt numbness, tingling, and weakness in her right arm. (R. 194). She rated her neck pain as 10/10, occurring without any apparent trigger. (R. 195). As her neck pain increased, she suffered from migraines. (R. 195). Dr. Saxena found that her neck movement was limited in all directions. (R. 196). There was also tenderness at C5-6 and at the facet joints at C2-3, C3-4, and C4-5. (R. 196). There was no loss in muscle strength in her arms, but reflexes were difficult to elicit. (R. 196). Spurling's sign was positive for both sides of her neck. (R. 196). Dr. Saxena prescribed Neurontin, along with Hydrocodone and Soma. (R. 196).

A month later, Ms. Gaffney had an MRI of the cervical spine that revealed small disc bulging at C4-5 through C6-7 with small anterior extra-dural defects along the thecal sac. (R. 283). There was no focal herniation, acute compression fracture, alignment abnormality, bony destructive lesions, intrinsic spinal cord lesions, or other significant stenosis. (R. 283).

Dr. Saxena administered a cervical epidural steroid injection in November 2004. (R. 276). Ms. Gaffney got some relief from the injection, so she requested and received another several months later in January 2005. (R. 275). In a follow-up visit the next month, Ms. Gaffney reported that she had good relief from the injections and that her headaches were more under control. (R. 274). Dr. Saxena found that she had limited neck movements and tenderness. (R. 274). He continued her prescriptions. (R. 274). Ms. Gaffney got another cervical injection later that month on February 28, 2005. (R. 273). A month later, she visited Dr. Saxena again, complaining of continued migraines and numbness in her arms and the same level of pain. (R. 272). She said the injections gave 20%

9

relief in terms of the frequency of her migraines and spasms. (R. 272). Dr. Saxena noted limited neck movement and tenderness and continued her prescriptions. (R. 272).

Ms. Gaffney next saw Dr. Saxena in June 2005, and she said she had pain in both arms, but that her migraines were improving. (R. 271). Overall, in the previous month her pain had improved, but her neck pain had increased over the previous three days. (R. 271). Her neck movements were limited, but there was no tenderness. (R. 271). Dr. Saxena continued her prescriptions and increased her dosage of Neurontin. (R. 271). She saw Dr. Saxena again the next month, and complained of neck spasms and pain in both arms. (R. 270). Overall, however, her neck and arm pain had decreased, she felt better, and her headaches were under control. (R. 270). Dr. Saxena continued her prescriptions. (R. 270).

At Ms. Gaffney's next appointment with Dr. Saxena in October 2005, she reported that her neck pain had increased. (R. 269). This time, Dr. Saxena diagnosed her with fibromyalgia in addition to migraine headaches and continued her prescriptions. (R. 269). Two months later, Ms. Gaffney saw Dr. Saxena again, complaining of increased overall pain in her neck and shoulders and numbness in her hands. (R. 268). Dr. Saxena noted no changes and continued her prescriptions. (R. 268). Things were the same on February 21, 2006. (R. 267). Dr. Saxena found tenderness in her cervical facet joint, continued her prescriptions, and advised that he may perform another series of injections. (R. 267).

Three months later, Ms. Gaffney was back at Dr. Saxena's office, complaining of severe migraines. (R. 266). Dr. Saxena continued her prescriptions but substituted hydrocodone for vicodin. (R. 266). In August of 2006, Dr. Saxena found limited neck movements and tenderness

in the midline of the C6-C7 vertebrae. (R. 265). Dr. Saxena continued her prescriptions. (R. 265). It was the same story on subsequent visits in November 2006 (R. 264) and April 2007 (R. 263).

In June of 2007, Ms. Gaffney was still complaining of neck pain and migraines, and also numbness in her left arm. (R. 262). Dr. Saxena found tenderness in her neck and continued her prescriptions. (R. 262). She had another epidural steroid injection on August 14, 2007. (R. 260-61). At her next visit on September 6, 2007, Ms. Gaffney reported that her neck pain had decreased by roughly 20%. (R. 259). Dr. Saxena found that her neck movement was limited, and her left facet joints were tender. (R. 259). A month later, Dr. Saxena's examination revealed the same findings. (R. 258). The doctor continued the regimen of prescription pain relievers and injections. (R. 258).

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

Ms. Gaffney was forty-five years old at the time of the administrative hearing. (R. 13). She is married with one child. (R. 13). She graduated from high school, had one year of college, and has several IT certifications. (R. 14). She testified about her last job, which was at the Chicago Board Options Exchange, where she had worked for five years. (R. 14-15). She took maternity leave from that position in December 2000, and did not return. (R. 16). She received her regular salary during her maternity leave, which lasted for approximately three months. (R. 21). She said she was still capable of performing her job when she left. (R. 15).

Ms. Gaffney testified that she had complications in childbirth, and was unable to walk for either a week or a month thereafter – she wasn't clear. (R. 21, 22). She said it took a while longer for her to regain her strength, probably nine months. (R. 24). Her mother or friends or her sister

11

would help her during that period. (R. 22). After over a year, Ms. Gaffney said was able to care for her child, though she was unable to perform activities around the house. (R. 23.) She still required her mother's help for those tasks. (R. 23). After she began to feel better, her back went out. (R. 24). She required extensive chiropractic treatment, and received help from her sister to watch her daughter while she was at the doctor. (R. 24). She later recovered from this, and began performing her child care and household activities. (R. 24-25).

Then, Ms. Gaffney looked for part-time IT positions. She applied to a number of companies in downtown Chicago, including her old employer, but couldn't find anything. (R. 26-27). At the time, her husband was out of work, and they were going bankrupt. (R. 26). She also tried to start her own business selling children's books at parties for other parents. (R. 17, 26). The business entailed standing in front of other people, taking orders, delivering books, and distributing them. (R. 18). These presentations were normally with friends and others who would accommodate her. (R. 46). Ms. Gaffney was able to rely upon others to lift the book containers. (R. 18-19). She could not work full time, because she was suffering from severe back pain and headaches, which limited her ability to maintain a regular schedule. (R. 25-26). She only scheduled one or two book presentations per week, and she missed some of those meetings. (R. 26). Apart from this project, Ms. Gaffney did not have any other income after 2000, nor did she find any work afterwards. (R. 20, 28). She continued with her book business until the summer of 2004, when she stopped because of the physical difficulty and her failure to realize profits. (R. 18-19). She made less than $800.00 in both 2003 and 2004. (R. 19).

Between December 1, 2000 and December 31, 2005, Ms. Gaffney was not hospitalized. Dr. Saxena recommended surgery at one point, but Ms. Gaffney instead opted for chiropractic care and

physical therapy. (R. 29.) Ms. Gaffney received three series of injections for her back: the series in the 1990's did not provide any relief; the next series provided some temporary relief for three to four months, but nothing permanent. (R. 30, 47). The final series on 2007 did not provide any relief. (R. 47).

Ms. Gaffney testified that she was able to perform normal household and childcare tasks, including: changing diapers, washing dishes, laundry, food shopping. (R. 30-31). She would use the shopping cart for stability when she went grocery shopping. (R. 31). Even then, she took her time, taking breaks and resting. (R. 34). She used to garden, but she did not do that anymore. (R. 32). Ms. Gaffney had trouble performing a number of activities for extended periods of time, including: sitting, standing, and walking. (R. 33-34). She also has trouble with her balance, and has fallen before. (R. 35). Ms. Gaffney still uses a computer, and used one to process orders when she was selling books. (R. 36-37). She still drives, and often drove when she was selling books. (R. 36, 38). She has trouble sleeping because of her pain. (R. 46.) She will often take breaks during the day because of her pain. (R. 46).

As she testified, Ms. Gaffney said she felt throbbing neck and back pain, and her right arm was completely numb. (R. 38). She has felt that neck pain constantly, every day since 1995, and lower back pain constantly, every day since 1991. (R. 39-40). She rated her neck pain at the hearing as a seven, and stated that it has been worse numerous times during her disability period. (R. 39). She said her back pain during the hearing was a five, and that it is radiating into her right leg. (R. 40). Both her neck and back pain will often spread to adjacent areas of her body. (R. 39). Ms. Gaffney also stated that had a severe headache, which occurs once a day. (R. 41). She rated her present headache as a seven. (R. 41). She began having migraine headaches in 1999. (R. 45). She

13

refused to take medication for her migraines ever. (R. 45). Also, she said she didn't take any pain medications while nursing her child. (R. 43). But she had prescriptions for Hydrocodone, Soma, Neurontin, Cymbalta, and Amitriptyline (R. 41), and starting taking those medications thereafter. (R. 43).

Ms. Gaffney's new doctor – Dr. Saxena retired – is Dr. Veriquois, whom she sees every three months. (R. 42.) Ms. Gaffney said she took Cymbalta for depression, but did not see anyone for that condition. (R. 42.) She had been taking Cymbalta only recently, no earlier than 2006. (R. 43). Ms. Gaffney stated that she could pick up a pen with both of her hands, but that she may drop it. (R. 44-45). She said if she had a migraine, she couldn't reach; she could hardly breathe. (R. 45).

## 2.
## Vocational Expert's Testimony

Following Ms. Gaffney's testimony, Lee Knutson, the vocational expert ("VE"), testified. The ALJ asked Mr. Knutson to assume that the person could lift up to 20 pounds occasionally; lift or carry up to ten pounds frequently; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally balance, stoop, crouch; never kneel or crawl; and avoid exposure to unprotected heights. (R. 50). The VE said that such an individual could perform Ms. Gaffney's previous computer and office manager work as she performed it and as it was customarily performed. (R. 49-50). The ALJ modified the hypothetical with additional restrictions: the person could frequently, but not constantly handle objects; frequently finger; and occasionally reach overhead bilaterally. (R. 50). The VE expert stated that such a person could still perform Ms. Gaffney's past work. (R. 51).

14

The ALJ modified the hypothetical once more by changing the exertional level from light to sedentary, meaning the person could lift objects weighing no more than ten pounds and work in a seated position. (R. 51). Based on this limitation, the VE stated that such an individual could not perform Ms. Gaffney's her old work as she performed. (R. 51). They could, however, work as a computer analyst or an office manager as that work is generally performed. (R. 51) The VE said that there were also other jobs in the region that such a person could perform: order clerk (approximately 3600 jobs), surveillance system monitor or unskilled security personnel (approximately 2000 jobs), or sedentary cashier (approximately 4800 jobs).

The ALJ modified the hypothetical yet again, adding the restriction that the person had to alternate between sitting and stand at will, but would not be off task for more than 10% of the day. (R. 52). This still allowed for the performance of Ms. Gaffney's previous jobs of computer analyst or office manager as generally performed. The VE added that this would still not preclude the jobs of sedentary cashier (approximately 4300 jobs), order clerk (approximately 3200 jobs), or surveillance system monitor or unskilled security personnel (approximately 1800 jobs). (R. 52.)

There were still more changes to the hypothetical. The ALJ asked what would happen if one were also limited to simple, routine, and repetitive tasks. (R. 53). This limitation precluded all of Ms. Gaffney's past work. (R. 53). But one could still work as an order clerk (approximately 3200 jobs), surveillance system monitor (approximately 1800 jobs), information clerk (approximately 4600 jobs), or cashier (approximately 4300 jobs). In response to final hypothetical question, the VE testified that a person who could not work on a regular or continuing basis for a 40-hour work week due to medical conditions and concentration impairments would be excluded from all competitive work. (R. 53). A person needing to be absent 10% of the time could not hold an unskilled job. (R.

15

54). Rest time exceeding five to fifteen minutes every two hours with lunch would eliminate the jobs that he referred to earlier. (R. 54).

### III.
### ALJ's Decision

The ALJ found that Ms. Gaffney was not disabled within the meaning of the Social Security Act from December 1, 2000, to the date last insured of December 31, 2005. (R. 63). Using the five-step sequential analysis, the ALJ first found that Ms. Gaffney had not engaged in substantial gainful activity during the period at issue. (R. 65). Second, he found that Ms. Gaffney suffered from four severe impairments: degenerative disk disease in the lumbar spine and the cervical spine, fibromyalgia, and headaches. (R. 65). These impairments limited Ms. Gaffney to sedentary work since the onset date. (R. 65). The ALJ did not find that Ms. Gaffney was suffering from depression, as there was no indication that she had been treated for it apart from a prescription for Cymbalta. (R. 65). Also, her depression had no detrimental effect in the four broad functional areas defined in the disability regulations for mental impairments. (R. 65-66). Third, the ALJ determined that Ms. Gaffney did not have any impairments or combination of impairments that are listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, nor did any of her impairments medically equal one of the listed impairments. (R. 66). In particular, Ms. Gaffney's symptoms and medical history did not meet the level of severity for degenerative disk disease in Listing 1.04. (R. 66-67).

The ALJ then found that Ms. Gaffney had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a). (R. 67). This included the capability to occasionally climb ramps or stairs, balance, stoop, crouch, and reach overhead. (R. 67). Ms. Gaffney could frequently handle objects and perform fine manipulations. (R. 67). She had to avoid

16

exposure to unprotected heights, and could never climb ladders, ropes, or scaffolds, kneel, or crawl. (R. 67). And she had to alternatively sit or stand, but would not be off task for more than 10% of a work day. (R. 67).

The ALJ did not find Ms. Gaffney's testimony entirely credible. He explained that her statements regarding the intensity, persistence, and limiting effects or her symptoms were not credible. (R. 68). She had not been hospitalized during the period of time at issue, and her MRIs did not indicate a spinal impairment that should have caused the kind of severe pains caused by Ms. Gaffney. (R. 69). There was a single clinical finding indicating limited range of motion, but the ALJ noted that an inability to flex the lumbar spine more than fifteen degrees would make sitting impossible, and there was no indication that Ms. Gaffney had to refrain from sitting. (R. 69). The ALJ also noted that Ms. Gaffney said she had no difficulty driving. (R. 69). Examinations revealed she had no muscle weakness. The ALJ stated that Ms. Gaffney's fibromyalgia diagnosis was not accompanied by any evidence of the trigger points typical of that impairment. (R. 69). And in any event, the ALJ found that the evidence of limitations from the fibromyalgia and headaches did not preclude sedentary work. (R. 69). No doctor ever stated that Ms. Gaffney was disabled. (R. 69).

Next, the ALJ found that Ms. Gaffney was unable to perform her past relevant work as a computer analyst, support specialist, or office manager. (R. 69). But, he determined that there was a significant number of jobs in the economy – cashier, order clerk, and surveillance monitor – that Ms. Gaffney could have performed, relying on the testimony of the VE. (R. 70). Accordingly, he found her not disabled and not entitled to DIB. (R. 70-71).

17

# IV.
## Discussion

### A.
### Standard of Review

This court will review the Commissioner's decision and only reverse it if it is not supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citations omitted). This court will view the record in its entirety, but will not reevaluate the evidence or substitute the ALJ's judgment with its own. *Id.* Where the evidence conflicts such that reasonable minds could differ, the Commissioner will resolve those conflicts. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

The substantial evidence standard is deferential, *Terry*, 580 F.3d at 475, but the court will not affirm the decision unless the Commissioner has "buil[t] a logical bridge from the evidence to the conclusion." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696 (7th Cir. 2009) (citations omitted). The ALJ must articulate the reasons for his decision to allow the reviewing court to assess the validity of its findings and afford meaningful judicial review. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). An ALJ is required to review all of the evidence and cannot select only that evidence which supports his conclusion. *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). On the other hand, an ALJ's conclusions of law are not entitled to deference. *Binion*, 108 F.3d at 782. Notwithstanding an overwhelming amount of evidence in favor of the decision, the Commissioner's decision must be reversed if it is based upon an error of law. *Id.*

18

## B.
## Five-Step Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy.

20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009). An affirmative answer in step one requires the ALJ to address step two; likewise, an affirmative answer in step two requires the ALJ to address step three. 20 C.F.R. § 404.1520. If step three is affirmative, then the plaintiff is disabled, otherwise the ALJ must address step four. *Id.* If the ALJ finds that the plaintiff is unable to perform her past work, then the analysis proceeds to step five. *Id.* At step five, a yes answer requires a finding of disability, and a no answer requires the contrary. *Id.* If any of steps one, two, or four are answered in the negative, then the inquiry is ended and the plaintiff is found not disabled. *Id.* At steps one through four, the plaintiff bears the burden of proof, and at step five, the burden shifts to the Commissioner. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

19

**C.**
**Analysis**

Ms. Gaffney advances three arguments for reversal or remand of the ALJ's denial of disability benefits. First, she argues that the ALJ's residual functional capacity finding is contrary to Social Security Ruling ("SSR") 96-8p. Second, she submits that the ALJ erred in rejecting Dr. Saxena's clinical findings, contrary to 20 C.F.R. 404.1527(d)(2), and failed to address the factors of SSR 96-7p in his credibility finding. Finally, she says the ALJ's findings with regard to the fibromyalgia diagnosis are inconsistent.

**1.**

Ms. Gaffney argues that the ALJ mischaracterized some of the evidence, did not take the entire spectrum of evidence into account and accordingly made an improper finding with regard to her RFC. In her brief, Ms. Gaffney argues that the ALJ should not have found that she could perform a limited a range of limited sedentary work, as there was evidence of symptoms in the record that was either not addressed in the ALJ's opinion or misconstrued. In particular, Ms. Gaffney singles out the medical records concerning the relief from her epidural injections and her reflexes as mischaracterized, and points to her migraines, her limited neck movements, her bilateral radiculopathy pain, numbness in her hands, and her tendency to drop things as examples of symptoms that the ALJ disregarded. (Pl's Mem. at 7-9.)

With regard to the evidence the ALJ purportedly mischaracterized or ignored in determining her RFC, Ms. Gaffney focuses on the ALJ's statement that:

> Dr. Saxena then tried a series of cervical epidural objections at the C6-C7 level. These infections were carried out on November 18, 2004, January 17, 2005, and February 28, 2005, with what was described as good relief. Another epidural injection was carried out in August of 2007.

20

(R. 68). Ms. Gaffney submits that this means the ALJ felt she had no symptoms in her neck from February 2005 to August 2007. (*Plaintiff's Memorandum*, at 7). The ALJ actually said nothing of the kind. The ALJ clearly didn't think she was "cured" because he found she had a *severe* cervical impairment that played a part in limiting her less than full range of sedentary work.

Ms. Gaffney also complains that the ALJ said that "Dr. Saxena's reports indicate some reflex abnormalities." (R. 68). Ms. Gaffney suggests that the ALJ was using the word "some" to minimize her problems. (*Plaintiff's Memorandum*, at 7-8). Again, this just can't be read into the opinion. The ALJ clearly discusses the exact reflex abnormalities Dr. Saxena reported: "Reflexes were difficult to elicit." (R. 68). She argues that she cannot perform sedentary work because she cannot grip things because of the numbness in her hands. (*Plaintiff's Memorandum*, at 7-8). But there is no medical evidence of decreased grip strength. The only report Ms. Gaffney points to other than her own allegations states that she complained of "neck pain, back pain, shoulder pain, both hands [illegible]." (*Plaintiff's Memorandum*, at 7, *citing* R. 268). The illegible word might be "numb" as Ms. Gaffney apparently thinks, but it might not. More importantly, the rest of the notes make no mention of hand problems, and the actual diagnosis is limited to lower back, degenerative disc disease, and neck pain, with no mention of a hand impairment, as one would expect if the problem were chronic. (R. 268). After all, her other complaints were made with regularity. Her failure to complain about her hands is therefore significant. *Cf. United States v. Useni*, 516 F.3d 634, 652 (7th Cir. 2008)(impeachment by omission); *Moylan v. The Meadow Club, Inc.*, 979 F.2d 1246, 1249 (7th Cir. 1992)(same).

From there, Ms. Gaffney moves on to the ALJ's consideration of her migraines. She finds fault with the ALJ saying that the medical evidence did not indicate they were not of the frequency

21

and severity that would preclude all work. But the only evidence of migraines is Ms. Gaffney's allegations – she never presented with a migraine to a physician, nor did any physician ever describe the severity level of the headaches, the limitations they might cause, or suggest they were disabling. *See Getch v. Astrue*, 539 F.3d 473, 482-83 (7th Cir. 2008)(treating physician did not identify any limitations stemming from impairment, nor describe an actual "flare-up"). And Ms. Gaffney's allegations regarding the migraines aren't even consistent.

At her hearing she said she had a disabling headache every day. But she never told her doctors that. On many visits, there was no report of a migraine, or a report that they were under control. And on one occasion, she told her physician that she had a migraine once every ten days and that the most frequently she ever experienced them was once or twice a week. (R. 272). The ALJ clearly considered all the evidence regarding Ms. Gaffney's migraines, combined with her other impairments; he did not disregard it as Ms. Gaffney contends. *See Getch*, 539 F.3d at 483 (rejecting plaintiff's argument that ALJ failed to consider all impairments when the ALJ stated otherwise).

Overall, Ms. Gaffney's arguments – consisting as they do of snippets of evidence the ALJ failed to mention or phrased differently than they were phrased in the medical record – are akin to the kind of "nitpicking," in which the court is not allowed to engage. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000). ALJ opinions must be given a commonsensical reading, and an ALJ does not have to discuss every piece of evidence in a record. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Getch*, 539 F.3d at 480. It is enough that an ALJ's opinion shows that he considered all *lines* of evidence, and the ALJ did that here. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir.2003).

22

Ms. Gaffney next argues that the ALJ improperly rejected Dr. Saxena's clinical findings, which she argues should be afforded controlling weight, or should be accorded deference and weigh more heavily in the final decision. Ms. Gaffney refers to Dr. Saxena's finding in August 2004 that she had nearly no range of motion at all in her lumbar spine. The ALJ made note of the rather minimal findings from objective medical studies like MRIs and x-rays, and also noted that sitting would be impossible if Ms. Gaffney was unable to bend more than fifteen degrees and she had said she had no trouble sitting and driving. Accordingly, he determined that when Dr. Saxena said Ms. Gaffney could barely move her back, the doctor was essentially uncritically accepting her complaints. This was an entirely appropriate course for the ALJ to take. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). It also serves as a basis to reject Ms. Gaffney's contention that in rejecting Dr. Saxena's finding on this point, the ALJ failed to cite any inconsistent medical evidence. The MRIs and x-rays were inconsistent with such an incapacitating limitation, as the ALJ said.

Moreover, Ms. Gaffney's brief overstates the matter when it says the ALJ rejected Dr. Saxena's opinion. The doctor never provided an opinion regarding Ms. Gaffney's ability to work. He never said she was unable to perform sedentary work or any work for that matter. But even if he had, that opinion is not inevitably to be accorded the weight of an encyclical. The limitations on and the real thrust of the so-called "treating physician rule" were explained at length in Judge Posner's panel opinion in *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir.2006). As the opinion made clear, "the fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony, since, as is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits, . . . will often bend over backwards

to assist a patient in obtaining benefits." *Id.* at 377. *See also Kettelboater v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)(ALJ can discount opinion of treating physician if "inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints....").[1]

In short, the Seventh Circuit has "'disapproved any mechanical rule that the views of a treating physician prevail.'" The "'treating physician's views may not be accepted unless there is a good reason to believe that they are accurate.' .... Conversely, when the views of the treating physician are accurate and supported by medical evidence, those views may be accepted.'"*Zeigler Coal Co. v. Office of Workers' Compensation Programs,* 490 F.3d 609, 616 (7th 2007). *See also Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir.2001)("a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work"). *See generally Farrell v. Sullivan,* 878 F.2d 985, 989 (7th Cir.1989) ("The ALJ can weigh evidence and make judgments as to what evidence is most persuasive.").

At bottom, this was a case where the ALJ had to consider a list of subjective limitations that were extremely severe along side objective medical studies where impairments were characterized as mild or small or even unremarkable. That Ms. Gaffney had symptoms from her impairments the ALJ did not doubt – he found her limited to less than a full range of sedentary work. But the point is that he felt she was exaggerating her limitations, not only at the hearing but to her doctor as well.

---

[1] Ms. Gaffney also questions the fact that the ALJ accepted some portions of Dr. Saxena's report while rejecting the range of motion findings. Specifically, Ms. Gaffney argues that the ALJ improperly discredited Dr. Saxena's findings regarding her range of motion while relying on his clinical findings that there was no muscle weakness. But there is nothing improper about an ALJ crediting some portions of a doctor's report while rejecting others, as long as he provides a rationale for having done so. *Diaz v. Chater,* 55 F.3d 300, 307-08 (7th Cir. 1995). Here, the ALJ explained why he disbelieved the range of motion study; it's simply not a rationale that Ms. Gaffney agrees with.

"[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *Getch*, 539 F.3d at 483; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) ("[T]he discrepancy between the minimal impairment expected from [claimant's] conditions and her testimony of debilitating pain casts doubt on her credibility."). Aside from the discrepancy between the objective medical evidence and her complaints, the fact that Ms. Gaffney might tend to exaggerate her problems is also exemplified by her allegation that she had a disabling migraine every day, which directly contradicted anything she ever told her doctors. *See Schaaf v. Astrue*, 602 F.3d 869, 876 (7th Cir. 2010)(inconsistency between severity and duration of pain related in testimony and that related to physician can be cause for finding claimant not credible).

Time and again, the Seventh Circuit has reminded the lower courts that they are not to substitute their judgments for that of the ALJ on issues of credibility since the ALJ was in a far greater position to make the credibility judgment. What Justice Cardozo said about "[s]ubstitut[ing] statute for decision," applies equally to the repeated efforts of litigants to shift the responsibility for ultimate credibility judgments from the ALJ to the district court: "you shift the center of authority, but add no quota of inspired wisdom." Cardozo, The Growth Of The Law 133 (1924). Thus, the undeviating rule to be applied in reviewing an ALJ's credibility determination is that review is deferential, and the ALJ's conclusion must be upheld unless it is "patently wrong." *Schaaf*, 602 F.3d at 875. *See also Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). We look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported. *Schaaf*, 602 F.3d at 875; *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). Here, the ALJ's determinations were not patently wrong and his reasons for discrediting testimony were neither unreasonable nor unsupported. He

quite properly rejected portions of the claimant's testimony, no doubt recognizing that applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case. *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006).

### 3.

Ms. Gaffney briefly argues that the ALJ improperly found her complaints not fully credible, and that the ALJ did not give appropriate attention to her testimony regarding her restricted activities.[2] But an ALJ's credibility assessment will stand "as long as [there is] some support in the record," *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007); *Berger v. Astrue,* 516 F.3d 539, 546 (7th Cir. 2008), and here, there was. The ALJ acknowledged that Ms. Gaffney testified that her activities were restricted. He also recited her course of treatment, the objective medical evidence, and her work history. She did not stop working due to her impairments, but to go on maternity leave. In addition, she had a home business selling children's books in 2003 and 2004. That wasn't full-time work, but it was work, and it was appropriate to consider it along with the rest of the evidence. *See Schmidt,* 496 F.3d at 843; *Williams-Overstreet v. Astrue,* 2010 WL 431447, *5 (7th Cir.

---

[2] The regulations and SSRs' requirement that an ALJ consider a claimant's daily activities does not mean that a claimant who can perform certain daily tasks inevitably must be found to be able to work. There are a number of cases in this Circuit that have criticized ALJs for putting to much stock in what an individual can do around the house, reasoning that those activities cannot be equated to full-time work. *See e.g., Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir.2006); *Gentle v. Barnhart,* 430 F.3d 865, 867-68 (7th Cir. 2005). Even activities like hour-long walks and swimming have been found inadequate to support an ALJ's conclusion that a claimant would be able to hold a full-time job. *Carradine v. Barnhart,* 360 F.3d 751, 756 (7th Cir. 2004). Under these and similar cases, it is not clear just what level of activity must be present before an ALJ can actually point to it as a reason for finding a claimant not credible. It cannot be that an ALJ can only refer to daily activities as support for a claimant's credibility, because that is clearly not what the regulations and SSRs have in mind. In any event, here, the ALJ did not focus entirely on such testimony, but only looked to isolated points that tended to undermine specific allegations.

2010)("Although a claimant with a job may still be found disabled, see *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir.2005), an ALJ's assessment of residual functional capacity must be based on the relevant evidence in the record, which includes 'reports of daily activities'" and 'evidence from attempts to work,' see SSR 96-8p."). And contrary to Ms. Gaffney's implications, the ALJ didn't have to recount, word for word, Ms. Gaffney's testimony, it is enough that he summarized it and indicated he considered the elements that the SSRs and regulations required. *Schmidt*, 496 F.3d at 843.

### 4.

Finally, Ms. Gaffney argues about the ALJ's finding regarding her fibromyalgia diagnosis. She says it was inconsistent for the ALJ to have both found that her fibromyalgia was a severe impairment and that it had no effect on her RFC for a limited range of sedentary work. But while the ALJ stated that this impairment would not have an effect on his RFC finding of limited sedentary work, he did not state that this impairment carried no limitations at all for Ms. Gaffney's capability to work. The finding in question only stated that the fibromyalgia diagnosis did not *add* other limitations to his RFC determination that had been based upon her back and neck impairments. Simply because a severe impairment limits the ability to perform basic work activities does not mean that that impairment will necessarily limit the ability to perform *limited* sedentary work. *See, e.g., Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) (affirming ALJ's RFC determination that claimant could perform light work though having severe impairment of fibromyalgia in addition to degenerative disc disease and other impairments ).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is DENIED, and the

Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 9/3/10